Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

ATTORNEY FOR APPELLANT:

**JOANN M. PRICE**
Merrillville, Indiana

ATTORNEYS FOR APPELLEES:

**EUGENE M. VELAZCO, JR.**
Indiana Department of Child Services
Lake County Office
Gary, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**FILED**

Mar 08 2012, 9:38 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of R.H., minor child, and D.H., mother, | ) ) ) ) |
| D.H., | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) ) No. 45A03-1107-JT-339 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner, | ) ) |
| and | ) ) |
| LAKE COUNTY CASA, | ) ) |
| Co-Appellee. | ) |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Mary Beth Bonaventura, Senior Judge
Cause No. 45D06-1009-JT-174

March 8, 2012
**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

D.H. ("Mother") appeals the involuntary termination of her parental rights to her child, R.H. Mother challenges the sufficiency of the evidence supporting the juvenile court's judgment. We affirm.

**FACTS AND PROCEDURAL HISTORY**

Mother is the biological mother of R.H., born in February 2006. The facts most favorable to the juvenile court's judgment reveal that in April 2010, the Lake County office of the Indiana Department of Child Services ("LCDCS") was contacted by local law enforcement personnel because Mother had been arrested on Class D felony neglect and Class D felony performing sexual conduct in the presence of a minor charges for having engaged in sexual acts with another unnamed woman in the family home while R.H., another young child, and R.H.'s biological father observed.[1] At the time of their arrest, both parents were intoxicated.[2]

LCDCS assessment case worker Darice Shelby immediately investigated the matter and retrieved R.H. from the police station. R.H. was thereafter placed in foster care, as neither parent was available to care for R.H. Upon his arrival in foster care, the foster parent observed multiple old marks and bruises on R.H.'s back and buttocks. R.H. reported that he received the marks from his Mother who spanks him.

---

[1] The parental rights of R.H.'s biological father, Ro.H., were involuntarily terminated by the juvenile court in its June 2011 judgment. The biological father does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

[2] Mother later pleaded guilty to one count of Class D felony neglect of a dependent. She was sentenced to one year of incarceration, with all time suspended and ordered served on probation. Additionally, the parties agreed that at the time of sentencing, the judgment of conviction would be entered as a class A misdemeanor.

Mother has had significant involvement with LCDCS over the years and numerous substantiations for neglect with regard to her six older biological children. Three of Mother's older children were born testing positive for cocaine, one child was born with Fetal Alcohol Syndrome[3], and all the children had been adjudicated children in need of services ("CHINS"). By 2003, Mother's parental rights to all six of R.H.'s older siblings had been involuntarily terminated.

Following a hearing in May 2010, R.H. was adjudicated a CHINS. The juvenile court proceeded to disposition the same day and entered an order (1) formally removing R.H. from Mother's custody and (2) making R.H. a ward of LCDCS, retroactive to April 16, 2010. Although the juvenile court's dispositional order directed Mother to undergo a drug and alcohol evaluation, the court did not direct LCDCS to provide Mother with any additional referrals for services as it had on numerous previous occasions involving R.H.'s siblings. To the contrary, the juvenile court determined, pursuant to Indiana Code section 31-34-21-5.6 that "[r]easonable efforts to reunify [R.H.] with the parent . . . or to preserve the family are not required . . . ." State's Ex. E, at 2.; *see also* Ind. Code § 31-34-21-5.6(b)(4) (providing that a court may determine at any time that reasonable efforts to reunify child with child's parent are not required if child is CHINS and parental rights of parent have been involuntarily terminated with regard to adopted or biological sibling of that child). Notwithstanding its finding that reasonable efforts were not required, the juvenile court recommended that Mother participate in drug and alcohol treatment, parenting classes, and random drug screens for at least six months. The court's

---

[3] The record is unclear as to whether the child born with Fetal Alcohol Syndrome was one of the three children that was also born testing positive for cocaine.

dispositional order further directed LCDCS to continue to monitor Mother's compliance with its previously ordered services.

Mother remained incarcerated from April through June 30, 2010. Upon her release, Mother made monthly contact with LCDCS case workers to inquire about R.H.'s well-being. Although LCDCS provided Mother with a list of service providers so that she could obtain reunification services on her own, she failed to do so. In September 2010, the juvenile court authorized LCDCS to file a petition requesting the involuntary termination of Mother's parental rights to R.H.

An evidentiary hearing on LCDCS's termination petition was eventually held in June 2011. During the termination hearing, LCDCS presented evidence establishing that Mother was living in a condemned building, was unemployed, had failed to complete any of the suggested reunification services and programs recommended by LCDCS, and remained unable to demonstrate that she could provide R.H. with a safe and stable home environment. In addition, LCDCS presented evidence showing R.H. was living and thriving in a pre-adoptive foster home. At the conclusion of the termination hearing, the juvenile court took the matter under advisement. Later the same day, the juvenile court entered its judgment terminating Mother's parental rights to R.H. This appeal ensued.

## DISCUSSION AND DECISION

When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the

4

juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's parental rights, the juvenile court entered specific findings and conclusions. When a juvenile court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001).

5

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

> (B)     that one (1) of the following is true:
>
>> (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C)     that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).  The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'"  *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).  Moreover, if the court finds that the allegations in a petition described in Indiana Code section 31-35-2-4 are true, the court *shall* terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).  Mother challenges the sufficiency of the evidence supporting the juvenile court's findings as to subsection (b)(2)(B) & (C) of the termination statute cited above.  *See* Ind. Code § 31-35-2-4(b)(2).

## I. Conditions Remedied/Threat to Well-Being

To properly effectuate the termination of parental rights under Indiana Code section 31-35-2-4(b)(2)(B), the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence.  *See e.g., L.S.*, 717 N.E.2d at 209.  Here, the juvenile court determined that the

first two elements of subsection (b)(2)(B) had been established. Because we find it to be dispositive under the facts of this case, however, we shall only discuss whether LCDCS established, by clear and convincing evidence, that there is a reasonable probability the conditions resulting in R.H.'s removal or continued placement outside of Mother's care will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

When making such a determination, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The juvenile court may also consider any services offered to the parent by the county department of child services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Moreover, LCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

On appeal, Mother does not claim that any of the juvenile court's findings of fact were unsupported by the evidence. In addition, Mother "concedes" that Indiana's

7

termination statute permits a juvenile court to take into consideration a parent's previous involvement with the Indiana Department of Child Services when considering involuntary termination decisions. *Appellant's Br.* at 8. Nevertheless, Mother asserts that the juvenile court "abused its discretion in relying entirely on Mother's past to the complete exclusion of evidence establishing Mother's fitness to parent at the time of the fact finding." *Id.*

In terminating Mother's parental rights, the juvenile court made numerous findings regarding Mother's "lengthy history of substance abuse," noting Mother had given birth to "three drug[-]exposed children." *Appellant's App.* at e. The court also found that Mother had an "extensive" history of "neglect" of her children, involvement with LCDCS, and non-compliance with "any case plan regarding the children." *Id.* Additionally, the court noted that Mother "has at least seven [biological] children, none of [whom] are in her care today." *Id.* With regard to the circumstances surrounding R.H.'s removal from the family home, the juvenile court found that Mother had been observed engaging in a sex act with another woman "in front of [R.H.]," that four-year-old R.H. was found wearing a "very soiled diaper," that Mother was intoxicated, and that immediately following his removal R.H. was observed with "marks and bruises on his body." *Id.* at d.

As for Mother's current ability to care for R.H., the juvenile court specifically found that Mother "does not have stable housing and is currently living in a condemned building." *Id.* In addition, although the juvenile court acknowledged that Mother was not offered any services through LCDCS in R.H.'s CHINS case due to Mother's

8

"extensive history," the court further found that despite having been given "a list of services that [Mother] could seek out and complete on [her] own," she failed to complete "any" of these recommended services. *Id.* Finally, the court found, "It is unlikely that either parent will be in a position to properly parent this child. Relative placement was explored, but the relatives were not in a position to parent [R.H.] due to the number of [M]other's children that they had in their care and custody." *Id.* Our review of the record leaves us convinced that ample evidence supports the juvenile court's findings cited above.

At the time of the termination hearing, Mother's circumstances remained largely unchanged. Although Mother appears to have maintained her sobriety for several months as part of the terms of her criminal probation, testimony from current LCDCS case manager Sheila Walker confirmed that Mother had failed to successfully participate in and/or complete a substance abuse treatment program at the time of the termination hearing, and that Mother's long-term ability to maintain her sobriety without the threat of probation revocation and after so many years of addiction and abuse remained unknown. Moreover, Mother had failed to complete any parenting classes, was living in a condemned building, and was unemployed. When asked whether she felt like Mother would ever be able to remedy the reasons for R.H.'s removal, Walker answered in the negative. Walker further informed the juvenile court that Mother's ability to parent appeared to be going "from bad to worse" in light of her "long history of neglect, extensive [past] drug use," and the more recent "physical abuse substantiations" involving R.H. *Tr.* at 50.

9

As noted above, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *D.D.*, 804 N.E.2d at 266. Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, Mother has demonstrated a persistent unwillingness and/or inability to take the actions necessary to show she is capable of providing R.H. with the safe, stable, and drug-free home environment the child needs. Based on the foregoing, we conclude that the juvenile court's determination that there is a reasonable probability the conditions resulting in R.H.'s removal from Mother will not be remedied is supported by clear and convincing evidence. Mother's unsubstantiated assertions to the contrary amount to an impermissible invitation to reweigh the evidence. *D.D.*, 804 N.E.2d at 265.

## II. Best Interests

We next consider Mother's assertion that LCDCS failed to prove that termination of her parental rights is in R.H.'s best interests. In determining what is in the best interests of a child, the juvenile court is required to look beyond the factors identified by LCDCS and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.*

10

In addition to the findings previously cited, the juvenile court made several additional pertinent findings relating to R.H.'s best interests, including the following:

> There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child . . . for the reasons stated above. Additionally, the child deserves a loving, caring, stable and safe adoptive home.

> It is in the best interests of the child and his health, welfare, and future that the parent-child relationship . . . be forever fully and absolutely terminated.

*Appellant's App.* at e. These findings, too, are supported by the evidence.

In recommending termination of Mother's parental rights as being in R.H.'s best interests, Walker testified that "[R.H.]is in need of a permanent, loving, nurturing home in which all his needs will be met, and I don't feel that [Mother] . . . [is] able to provide that for him." Tr. p. 56. Walker further testified that R.H. was "bonding" with his current pre-adoptive foster family, "gets a lot of love and attention" from his foster mother, and is "doing real [sic] good." *Id.* at 59. Similarly, R.H.'s foster mother testified that R.H. presents as a "happy little boy," that he is "always smiling," and that he is "doing really well" at school. *Id.* at 69. The foster mother also confirmed that R.H. was receiving treatment for his ADHD, anger issues, and impulse control issues.

Based on the totality of the evidence, including Mother's untreated substance abuse issues, significant history of neglectful conduct toward all her children resulting in the involuntary termination of her parental rights to all seven children, and her continuing inability to provide R.H. with a safe and stable home environment, coupled with the testimony from Walker recommending termination of the parent-child relationship, we

11

conclude that there is ample evidence to support the juvenile court's determination that termination of Mother's parental rights is in R.H.'s best interests.

This court will reverse a termination of parental rights "'only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.'" *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

BARNES, J., and BRADFORD, J., concur.